# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
Filed: April 4, 2024

* * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| JOEL GRECO, | * | PUBLISHED |
| | * | |
| Petitioner, | * | No. 20-1932V |
| | * | |
| v. | * | Special Master Nora Beth Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Decision Awarding Damages; Tetanus- |
| AND HUMAN SERVICES, | * | Diphtheria-Acellular Pertussis ("Tdap") |
| | * | Vaccine; Brachial Neuritis; Pain and |
| Respondent. | * | Suffering. |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

Nancy Routh Meyers, Turning Point Litigation, Greensboro, NC, for Petitioner.
Meghan Murphy, U.S. Department of Justice, Washington, DC, for Respondent.

## DAMAGES DECISION[1]

On December 21, 2020, Joel Greco ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018).[2]  Petitioner alleged he suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of a tetanus-diphtheria-acellular pertussis ("Tdap") vaccination he received on September 28, 2018.  Petition at Preamble (ECF No. 1).  On October 28, 2022, Petitioner filed an amended petition alleging that he suffered a Table injury of brachial

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services).  **This means the Decision will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018).  All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

neuritis as a result of the Tdap vaccine administered on September 28, 2018.  Amended ("Am.") Petition at ¶ 18 (ECF No. 28).  On December 29, 2022, Respondent filed an amended Rule 4(c) Report, conceding Petitioner was entitled to compensation.  Am. Respondent's ("Resp.") Report ("Rept.") at 1 (ECF No. 30).  On December 29, 2022, the undersigned issued a ruling on entitlement, finding Petitioner entitled to compensation.  Ruling on Entitlement dated Dec. 29, 2022 (ECF No. 31).

The parties were unable to resolve damages and requested that the Court enter a schedule for damages briefs.  Since then, the parties' briefs have been filed.

After consideration of all of the evidence, and for the reasons described below, the undersigned finds that Petitioner is entitled to $100,000.00 for actual pain and suffering.[3]

## I.     PROCEDURAL HISTORY

Petitioner filed his petition on December 21, 2020 followed by medical records and affidavits.  Petition; Petitioner's Exhibits ("Pet. Exs.") 1-11.  Petitioner filed a supplemental affidavit on February 11, 2022.  Pet. Ex. 13.  Respondent filed his Rule 4(c) Report on April 26, 2022, recommending against compensation.  Resp. Rept. at 1 (ECF No. 22).

Thereafter, this case was reassigned to the undersigned on August 15, 2022.  Notice of Reassignment dated Aug. 15, 2022 (ECF No. 24).  Following a status conference on August 30, 2022, Petitioner filed an amended petition, adding a Table injury claim for brachial neuritis following Tdap vaccination, and Respondent filed an amended Rule 4(c) Report, conceding entitlement.  Order dated Aug. 31, 2022 (ECF No. 25); Am. Petition at ¶ 18; Am. Resp. Rept. at 1.  A Ruling on Entitlement issued on December 29, 2022.  Ruling on Entitlement.

Petitioner filed additional medical records on January 10, 2023.  Pet. Ex. 14.  From January 2023 to April 2023, the parties engaged in damages discussion, but were unable to resolve this matter.  Pet. Status Rept., filed Apr. 24, 2023 (ECF No. 43).  The parties agreed to submit the damages items that remained in dispute to the Court for resolution on the briefs.  Id. at 1.

On June 8, 2023, Petitioner filed a brief in support of his claim for damages.  Pet. Damages Brief ("Pet. Br."), filed June 6, 2023 (ECF No. 45).  Respondent filed his responsive brief on July 31, 2023.  Resp. Response to Pet. Br. ("Resp. Br."), filed July 31, 2023 (ECF No. 48).  Petitioner filed a reply on September 11, 2023.  Pet. Reply in Further Support of Damages ("Pet. Reply Br."), filed Sept. 11, 2023 (ECF No. 51).

This matter is now ripe for adjudication.

---

[3] Petitioner confirmed he is seeking only pain and suffering and confirmed "the only issue presently before the Court is the appropriate amount of damages to award for [Petitioner's] pain and suffering."  Pet. Damages Brief ("Pet. Br."), filed June 6, 2023, at 7 (ECF No. 45).

## II.    FACTUAL HISTORY

### A.    Medical Record History[4]

On September 28, 2018, at 40 years of age, Petitioner was involved in a motor vehicle accident that caused a loose piece of steel "angle iron" in his van to lacerate his right temple. Pet. Ex. 1 at 17, 20.  At the emergency department ("ED"), Petitioner received a Tdap vaccine.[5] Id. at 7.

One week later, on October 5, 2018, Petitioner presented to urgent care for "constant pain of the right upper extremity since Wed[nesday], Oct[ober] 03, 2018." Pet. Ex. 2 at 3.  Petitioner reported that he received a Tdap vaccination in his "[right] dominant shoulder" and "was slightly sore in the area for several days and then the pain went away."  Id.  Two nights prior to presenting to urgent care (October 3, 2018), "he began having excruciating pain in that same area of the right shoulder and now ha[d] limitation of [range of motion] due to the pain."  Id.  He described the pain as severe, aching, dull, and gnawing and rated the pain 8/10.  Id.  Petitioner also reported muscle pain, which the physician noted was "an abnormal symptom related to the complaint."  Id.  On examination, Dr. Lisa Plazzo noted Petitioner had "severe tenderness, with some erythema and warmth" in his right shoulder and severe tenderness in the right deltoid muscle and at the bursa.  Id. at 7.  Dr. Plazzo diagnosed Petitioner with bursitis; prescribed antibiotics (Augmentin), ibuprofen, and Norco for pain relief; and referred Petitioner to orthopedics.  Id. at 7-8.

Later that day, Petitioner presented to Dr. John S. O'Malley at EmergeOrtho for orthopedic evaluation of his right shoulder.  Pet. Ex. 3 at 20.  Petitioner reported that "approximately [two] days ago [on October 3, 2018,] he noticed a lot of pain in the lateral side of his right shoulder where he was given a tetanus shot" on September 28.  Id.  He stated he had no right shoulder pain at the time of or after the motor vehicle accident.  Id.  He rated his pain as 8/10 and described it as stabbing.  Id.  Petitioner reported that "certain range of motion such as abduction and reaching across his body cause[d] a lot of pain in the right shoulder."  Id.  The pain also affected his sleep, though ibuprofen and rest helped somewhat.  Id.  On examination of his right shoulder, Petitioner demonstrated tenderness to palpation over the lateral deltoid and lateral cuff insertion, mild tenderness to palpation over posterior subacromial space, and limited active range of motion with forward flexion, external rotation, abduction, and internal rotation. Id. at 21.  Petitioner also had pain with crossbody testing and pain with lift-off and belly press on examination.  Id.  X-rays revealed no acute fracture or dislocation of the right shoulder.  Id.  Dr. O'Malley diagnosed Petitioner with a possible injury of his right rotator cuff from the motor

---

[4] This summary of medical records is taken from the parties' briefs as well as Respondent's Rule 4(c) Reports, as the undersigned finds the parties provided an accurate representation of the records.  See Resp. Rept. at 1-7; Am. Resp. Rept. at 2-8; Pet. Br. at 1-6; Resp. Br. at 2-8.

[5] The vaccination administration record documents Petitioner's Tdap vaccination was administered in his left deltoid; however, Petitioner contends that this medical record is incorrect and averred that he received the Tdap vaccination at issue in his right arm.  Compare Pet. Ex. 1 at 7, with Pet. Ex. 9 at ¶ 2; Pet. Ex. 10 at ¶ 2.

vehicle accident and possible post-injection pain from his Tdap vaccination.  Id.  He recommended oral anti-inflammatories as needed and ordered magnetic resonance imaging ("MRI") of the right shoulder.  Id.  MRI of the right shoulder without contrast conducted on October 10, 2018 revealed "[t]enosseous strain [at the] infraspinatus insertion" and "[m]ild peritendinobursitis."  Id. at 25.

On October 19, 2018, Petitioner returned to Dr. O'Malley to discuss the October 10, 2018 MRI results.  Pet. Ex. 3 at 16-17.  Petitioner reported his pain began after vaccination.  Id. at 17.  He explained the pain was sharp, radiated, and worse with pulling mechanisms, and he rated his pain 9/10.  Id.  Petitioner also reported soreness in his cervical spine.  Id.  Physical examination revealed tenderness at the right lateral cuff insertion, reduced range of motion secondary to pain, decreased strength, and positive impingement signs and Neer's test.  Id. at 18.  Dr. O'Malley noted that the "MRI [did] not show any significant structural damage of [Petitioner's] shoulder dissection."  Id.  Diagnosis was pain of the right shoulder joint.  Id.  Dr. O'Malley's assessment noted Petitioner had "some irritation from injection to his right shoulder," which he classified as "unusual."  Id.  Petitioner was prescribed an anti-inflammatory (Naproxen) and referred to physical therapy.  Id.

Petitioner presented for an initial physical therapy evaluation with Cameron Caffaro on October 24, 2018.  Pet. Ex. 3 at 14.  Petitioner reported pain over his right lateral deltoid that was sharp, dull, stabbing, aching, constant, and worsening, with a severity of 1/10 at best and 7/10 at worst.  Id. at 15.  Date of onset was documented as September 27, 2018 (the day before this vaccination).  Id.  He stated he felt the Tdap vaccination in his right arm was administered "too deep" and that he had normal pain after injection, but "noticed increased pain and irritation the day following."  Id.  Petitioner reported pain radiating from his right upper extremity into his hand, as well as tingling.  Id.  On examination, Petitioner demonstrated decreased strength and pain at the end range of his range of motion.  Id.  Mr. Caffaro found Petitioner's symptoms "most consistent with [a] diagnosis of infraspinatus tendonitis/bursitis."  Id. at 16.  He noted Petitioner demonstrated decreased strength, pain with active range of motion, and abnormal posturing, which he found "likely contribut[ed] to [symptoms] of pain and [] negatively impact[ed] [his] ability to perform [activities of daily living]."  Id.  Petitioner was recommended to attend two physical therapy sessions per week for four weeks.  Id.  It appears Petitioner returned for only one additional physical therapy session on October 31, 2018.  Id. at 13-14.

On October 31, 2018, Petitioner presented to his primary care physician ("PCP") for right arm pain.  Pet. Ex. 4 at 21.  At this visit, Petitioner reported that his pain began on September 30, 2018, and specifically stated "this started three days after a tetanus shot was given at the ED."  Id. at 22.  He rated his pain 10/10 and reported numbness, tingling, radiating pain down his arm, and increased pain with abduction and lifting overhead.  Id.  On examination, Petitioner demonstrated good range of motion and pain with abducting and lifting overhead.  Id.  Petitioner requested an ultrasound, as he had seen orthopedics and had an MRI with no resolution.  Id.

Petitioner's PCP referred him to Dr. Anna Bettendorf and recommended Petitioner see another physical therapist for evaluation of possible Parsonage-Turner Syndrome ("PTS").[6]  Id.

On November 6, 2018, Petitioner presented for an initial evaluation at the newly recommended therapy practice, PT by the Sea.  Pet. Ex. 5 at 3.  He reported receiving a Tdap vaccine on September 27, 2018 (the day prior to actual vaccination), and soon after began to experience acute right shoulder weakness and pain.  Id.  He described his pain as aching, deep, and stabbing, and was 1/10 at best and 7/10 at worst.  Id.  On examination, he demonstrated acute shoulder pain, weakness of the scapular stabilizers, mildly decreased range of motion, positive impingement, Hawkins, and lift-off testing, tenderness in the anterior deltoid and supraspinatus tendon, decreased sensation of the right forearm, and winging of the right scapula with active shoulder flexion.  Id. at 3-4.  Physical therapist Amanda Palmer found Petitioner's symptoms to be consistent with PTS.  Id. at 4.

Petitioner presented to Dr. Bettendorf, a physical medicine and rehabilitation ("PM&R") physician, on November 20, 2018 for "excruciating right upper limb pain starting about a week after he received a tetanus shot in the right deltoid on September 27[]."  Pet. Ex. 6 at 2.  Petitioner reported that "the severe pain" started "several days" after vaccination.  Id.  For three to four days, Petitioner could not move his arm due to the severe pain.  Id.  Petitioner stated that the pain was "not excruciating anymore," but fluctuated in severity.  Id.  Examination revealed atrophy of the right infraspinatus and supraspinatus muscles.  Id.  Dr. Bettendorf performed an electromyogram ("EMG"), which returned "mildly abnormal" results.  Id. at 2-3.  Dr. Bettendorf opined "[Petitioner's] clinical presentation [was] certainly consistent with [PTS]."  Id. at 3.  There were "no significant abnormalities, but the asymmetry in the lateral antebrachial cutaneous responses (smaller on the right), and the mild EMG abnormalities in biceps and infraspinatus could be consistent with [PTS]."  Id.

Petitioner continued to attend physical therapy sessions at PT by the Sea (10 total) until February 19, 2019.  See Pet. Ex. 5 at 3-27.  On January 9, 2019, at Petitioner's seventh visit, Petitioner reported less right shoulder pain with activities of daily living and work duties, and he was surfing without shoulder pain.  Id. at 16.  Assessment noted Petitioner reported "[shoulder] pain [was] no longer limiting tolerance for dressing, work duties[,] or recreational activities" and pain was "intermittent" with overhead movements and "[n]ot consistently painful."  Id. at 17.  On February 19, 2019, Petitioner reported his right shoulder pain had resolved, and he was discharged from physical therapy.  Id. at 23-27.

Three months later, on May 31, 2019, Petitioner underwent a second MRI without contrast of his right shoulder.  Pet. Ex. 7 at 8.  The results showed an intact rotator cuff, mild degenerative changes of the acromioclavicular joint, and bone marrow edema.  Id.  A handwritten note on the MRI results recommended Petitioner undergo an MRI with contrast and

---

[6] PTS, also known as brachial neuritis or neuralgic amyotrophy, is "pain across the shoulder and upper arm, with atrophy and paralysis of the muscles of the pectoral girdle."  Neuralgic Amyotrophy, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=55894 (last visited Apr. 1, 2024).  The undersigned uses brachial neuritis and PTS interchangeably throughout this Decision.

referred him to orthopedics.  Id.  On June 17, 2019, Petitioner underwent a third MRI of his right shoulder, this time with contrast, which showed bone marrow edema and abnormal increased signal in the distal supraspinatus tendon.  Id. at 7.

On June 18, 2019, Petitioner presented to PM&R physician Dr. Joanne Allen at Allen Spine and Sports Medicine for right shoulder pain.  Pet. Ex. 7 at 5.[7]  Dr. Allen questioned whether Petitioner's recent MRI showed a Hill-Sachs lesion.[8]  Id.  On examination, Petitioner had full strength.  Id.  Dr. Allen diagnosed Petitioner with right shoulder pain status post-tetanus shot, with bone marrow edema, Hill-Sachs lesion, and supraspinatus tendinopathy.  Id.  Petitioner was referred for further physical therapy.  Id.

On June 24, 2019, Petitioner returned to Dr. O'Malley for orthopedic follow-up of his right shoulder.  Pet. Ex. 3 at 9.  He reported "constant pain" that was "sporadic," described "as aching with occasional sharp pain," and rated as 5/10 that day.  Id. at 10.  He reported he "had physical therapy months ago without relief."[9]  Id.  On examination, Petitioner demonstrated lateral cuff tenderness; pain and limited range of motion with overhead flexion, abduction, and internal rotation; weakness with pain; and positive impingement sign and Neer's test.  Id. at 11.  Dr. O'Malley noted no sign of infection on Petitioner's most recent MRI of his right shoulder and that a conservative treatment plan, including discontinuing physical therapy and initiating a home exercise plan, would be best.  Id.  Petitioner was directed to follow up in four months.  Id.

Six-and-one-half months later, on January 7, 2020, Petitioner followed up with physician assistant ("PA") Joseph Ellender at Dr. O'Malley's office for his right shoulder.  Pet. Ex. 3 at 7-8.  Petitioner reported that his symptoms waxed and waned, ranging from 1/10 to 5/10 on the pain scale.  Id. at 8.  PA Ellender noted Petitioner "[was] very active and work[ed] installing garage doors."  Id.  Petitioner's past MRIs were noted to be "relatively unremarkable."  Id.  Petitioner denied paresthesias and radicular symptoms.  Id.  Petitioner requested another MRI for evaluation of his shoulder.  Id.  On examination, Petitioner exhibited tenderness over the acromioclavicular joint, deltoid muscle, and lateral cuff insertion, painful biceps tendon, and pain with range of motion.  Id.  PA Ellender noted Petitioner demonstrated "excellent strength and range of motion on exam[ination] today."  Id.  Diagnosis was impingement syndrome of the right shoulder.  Id.  An MRI was ordered and Petitioner was instructed to follow up following the MRI and as needed.  Id.

---

[7] Dr. Allen's record is handwritten and difficult to decipher.

[8] A Hill-Sachs lesion is a "compression fracture of the posteromedial humeral head, sometimes occurring with anterior dislocation of the shoulder, caused by impaction of the humeral head on the anterior rim of the glenoid fossa."  Hill-Sachs Lesion, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=85196 (last visited Apr. 1, 2024).

[9] At Petitioner's last physical therapy appointment on February 19, 2019, he reported that his right shoulder pain had resolved.  Pet. Ex. 5 at 23-27.

The MRI was conducted on January 10, 2020 and showed mild bursitis and tendinosis, while improvement of the bone marrow edema seen on previous exams was noted. Pet. Ex. 14 at 10.

Petitioner saw Dr. O'Malley next on March 21, 2022. Pet. Ex. 14 at 7. Petitioner reported ongoing pain that was "intermittent with certain movements" and was a 6/10. Id. Examination revealed "good functional range of motion of [Petitioner's] right shoulder" with "some catching if he [went] posterior quickly such as putting his belt to a belt loop." Id. Petitioner's "rotator cuff strength [was] well-maintained," Petitioner's strength was 5/5, there was no gross instability, and neurovascular was intact. Id. Dr. O'Malley noted that "[a]lthough [Petitioner] [was] able to perform his duties as a construction worker[,] he [did] have some pain with moderate activities occasionally." Id. Dr. O'Malley recommended physical therapy.[10] Id. at 7-8. Diagnosis was pain of right shoulder joint. Id. at 8.

No additional medical records have been filed.

## B.    Affidavits

### 1.    Petitioner

Petitioner received a Tdap vaccine in his right arm after sustaining a facial laceration during a motor vehicle collision. Pet. Ex. 9 at ¶ 2; Pet. Ex. 13 at ¶ 2. He explained he had soreness following vaccination, but on October 3, 2018, the pain began to be "extreme." Pet. Ex. 9 at ¶ 3; Pet. Ex. 13 at ¶¶ 3-5. He sought medical care on October 5, 2018 for his "right shoulder pain [that] had been extreme for about two days." Pet. Ex. 13 at ¶ 5.

Petitioner summarized his visits to medical providers over the years. Pet. Ex. 9 at ¶¶ 3-6. After he was diagnosed with PTS by Dr. Bettendorf, which was confirmed with an EMG, he continued physical therapy. Id. at ¶¶ 4-5. He averred that even after physical therapy ended in February 2019, "[his] pain continued" and "eventually plateaued somewhat" until May 2019, when he experienced a flare-up and underwent another MRI of his right shoulder. Id. at ¶ 5.

Petitioner averred that as of December 9, 2020, the date that he executed his affidavit, "the pain in [his] right shoulder comes and goes, and when it sets in, it generally lasts for a few days at a time and nothing alleviates it." Pet. Ex. 9 at ¶ 7. He rated his current pain between 3/10 and 7/10. Id. He noted "more time passes now in between flare-ups, and [he] [is] hopeful that eventually the pain will subside completely." Id. Petitioner's subsequent affidavit, executed February 11, 2022, did not discuss Petitioner's current state. See Pet. Ex. 13.

### 2.    Kelley Greco

Kelley Greco is Petitioner's wife. Pet. Ex. 10 at ¶ 1. Mrs. Greco was at the ED with Petitioner when he received the Tdap vaccine. Id. at ¶ 2. She witnessed Petitioner receive a Tdap vaccine in his right arm on September 28, 2018. Id.

---

[10] It does not appear Petitioner returned to physical therapy.

### III.    PARTIES' CONTENTIONS

####   A.    Pain and Suffering

#####     1.    Petitioner's Contentions

Petitioner requests a pain and suffering award of $130,000.00.  Pet. Br. at 1, 19; Pet. Reply Br. at 9.  In support of his request, Petitioner discusses awareness, severity, and duration of his injury and compares his case to others in the Vaccine Program.  <u>See</u> Pet. Br. 7-19; Pet. Reply Br. at 1-9.

First, Petitioner notes awareness of the injury is not in dispute.  Pet. Br. at 7.  At all relevant times, Petitioner "was fully aware of the scope, severity, and duration of his injury."  <u>Id.</u>

Regarding severity of Petitioner's injury, Petitioner contends his injury was significant.  Pet. Br. at 8.  One week after vaccination, on October 5, 2018, Petitioner described his pain as excruciating, rated the pain 8/10, and indicated the pain affected his range of motion.  <u>Id.</u> (citing Pet. Ex. 2 at 3; Pet. Ex. 3 at 20).  Two weeks later, on October 19, Petitioner reported pain that was sharp and radiated, and he rated the pain 9/10.  <u>Id.</u> (citing Pet. Ex. 3 at 16-18).  Physical examination that day revealed tenderness at the right lateral cuff insertion, reduced range of motion secondary to pain, decreased strength, and positive impingement signs and Neer's test.  <u>Id.</u> (citing Pet. Ex. 3 at 18).  On October 31, 2018, Petitioner rated his pain 10/10.  <u>Id.</u> (citing Pet. Ex. 4 at 21-22).  At a physical therapy evaluation on November 6, 2018, Petitioner described pain that was aching, deep, and stabbing, and he rated the pain 7/10.  <u>Id.</u> (citing Pet. Ex. 5 at 3).  On examination, he demonstrated acute shoulder pain, weakness, decreased range of motion, decreased sensation, and positive impingement, Hawkins, and lift-off testing.  <u>Id.</u> (citing Pet. Ex. 5 at 3-4).  Physical therapist Palmer determined Petitioner's symptoms were consistent with PTS.  <u>Id.</u> (citing Pet. Ex. 5 at 4).

Petitioner explains that even though his pain and limitations improved with physical therapy, the pain returned once physical therapy ended.  Pet. Br. at 8.  In June 2019, Petitioner described pain that was "aching with occasional sharp pain that was more intense," rating it 5/10 that day.  <u>Id.</u> at 8-9 (citing Pet. Ex. 3 at 10).  In January 2020, Petitioner exhibited tenderness over the acromioclavicular joint, deltoid muscle, and lateral cuff insertion, painful biceps tendon, and pain with flexion and with the empty can test.  <u>Id.</u> at 9 (citing Pet. Ex. 3 at 8-9).  And in March 2022, Petitioner reported right shoulder pain of 6/10.  <u>Id.</u> (citing Pet. Ex. 14 at 7).

Petitioner maintains he "has suffered pain in the top half of the ten-point scale for multiple years, with no indication that the pain will subside anytime soon."  Pet. Br. at 9.  This pain disrupts his job installing and repairing garage doors and disrupts his activities of daily living.  <u>Id.</u>  Petitioner enjoys surfing, which results in significant pain when he paddles.  <u>Id.</u>  He also experiences pain and difficulty when reaching across his body, for example, when putting on a seatbelt.  <u>Id.</u>

Petitioner also cited to his physical therapist's goals that required him to "make significant progress to get dressed without assistance, feed himself, and carry lightweight items such as a shopping bag," which he argues are "limitations [] inconsistent with a minor injury." Pet. Br. at 9-10. Additionally, the goals were "never intended to eliminate his pain; rather, the goal was for [Petitioner] to be able to participate in the activities he enjoys (surfing, etc.) with moderate (as opposed to intense) pain." Id. at 10. "This goal of pain reduction to moderate levels—which is ultimately what [Petitioner] achieved once his physical therapy sessions ended—further underscores the severity of [Petitioner's] injury." Id.

Next, Petitioner discussed the duration of his injury. Pet. Br. at 10-11. Petitioner contends that "[e]xcept for a brief period of relief immediately following his physical therapy in early 2019, . . . he has suffered through pain, weakness, and significant limitations for more than three years." Pet. Br. at 10-11. Petitioner maintains physical therapy was not intended to eliminate his pain, but reduce the pain from severe to moderate. Id. at 11. And this is "consistent with [Petitioner's] ongoing complaints of pain in the middle of the ten-point scale." Id. He notes his moderate pain continues to be disruptive and significant, and "his longstanding suffering" should not be undermined because "[his] pain is no longer excruciating." Id.

Petitioner disagrees with Respondent's argument that Petitioner's current pain and limitations are unrelated to his vaccine injury. Pet. Br. at 11-13. Petitioner argues that a finding of impingement is not a new diagnosis and has been present since onset of Petitioner's injury. Id. at 11 (citing Pet. Ex. 3 at 18 (finding positive impingement signs on physical examination on October 19, 2018)). Additionally, his treating physicians related the findings of impingement on examination to his vaccination and PTS. Id. at 12 (citing Pet. Ex. 3 at 18 (Dr. O'Malley noting Petitioner had "some irritation from injection to his right shoulder" in October 2018 after noting physical examination revealed positive impingement testing); Pet. Ex. 5 at 4 (physical therapist Palmer finding positive impingement signs in November 2018 and determining Petitioner's symptoms were consistent with PTS); Pet. Ex. 3 at 11 (Dr. O'Malley again finding positive impingement signs on physical examination in June 2019). After Petitioner completed physical therapy in 2019, and his pain returned, Petitioner was diagnosed with right shoulder pain status post-tetanus shot by Dr. Allen, which Petitioner argues contradicts Respondent's argument "that [Petitioner's] post-physical therapy pain is unrelated to his vaccine injury." Id.

Petitioner also argues there was no gap in treatment, despite Respondent's arguments to the contrary. Pet. Br. at 12; Pet. Reply Br. at 2-4. Petitioner maintains that there was no gap in treatment between the end of physical therapy in February 2019 and his MRI in May 2019, three months later. Pet. Reply Br. at 3. Petitioner explains this three-month period was not a gap in treatment and instead "a brief reprieve in [Petitioner's] pain levels immediately following the completion of physical therapy, after which [Petitioner's] pain returned in full measure, prompting him to seek significant additional treatment." Id. Next, regarding Respondent's argument there was a gap in treatment between June 2019 and January 2020, Petitioner explains he was following his treating provider's treatment plan for when to follow up next. Id. at 3-4; Pet. Br. at 12. And therefore, it is "insignificant" that the follow-up appointment occurred six months instead of four months later as Dr. O'Malley's note indicated, "particularly given the intervening holiday season." Pet. Reply Br. at 4.

Petitioner concludes his treating physicians determined his pain and limitations are related to his vaccination and subsequent injury. Pet. Br. at 12. "[Petitioner] has suffered the effects of PTS (pain, weakness, limitations, loss of enjoyment of activities, difficultly with daily life, etc.) for multiple years," and "[t]his duration is extensive." Id. at 12-13.

Lastly, Petitioner compares his case to other Vaccine Program cases to support his request of $130,000.00 for pain and suffering. Pet. Br. at 13-19. Petitioner first discusses Geller, a case of brachial neuritis following influenza vaccination where Respondent also conceded entitlement and the petitioner was awarded $125,000.00 for past pain and suffering and $2,500.00 per year, reduced to net present value, for the remainder of the petitioner's life expectancy for future pain and suffering. Id. at 15 (citing Geller v. Sec'y of Health & Hum. Servs., No. 17-1355V, 2021 WL 6502215, at *1 (Fed. Cl. Spec. Mstr. Dec. 17, 2021)); see Pet. Reply Br. at 4-6.

In Geller, the petitioner began to experience intense pain for a couple of weeks that began less than two weeks following a flu vaccination. Pet. Br. at 16 (citing Geller, 2021 WL 6502215, at *2, *8). Within one month, the Geller petitioner reported a reduction in his pain by 85% and described his pain as 1/10 or 2/10 the following month. Id. (citing Geller, 2021 WL 6502215, at *3). The Geller petitioner received treatment for lingering symptoms, mainly difficulty with fine motor tasks, over the next year. Id. (citing Geller, 2021 WL 6502215, at *4). His symptoms improved, albeit not fully. Id. (citing Geller, 2021 WL 6502215, at *4). He was able to return to activities such as running, biking, and skiing without difficulty. Id. (citing Geller, 2021 WL 6502215, at *7). The special master found "not all his deficits [were] the result of his vaccine related injury" due to other comorbidities at play. Id. (quoting Geller, 2021 WL 6502215, at *5).

Petitioner here acknowledges that he has not lost fine motor functions like the petitioner in Geller, but maintains Geller is comparable. Pet. Br. at 16. Petitioner asserts his intense pain lasted longer than the Geller petitioner's pain, which was severe "for about two weeks." Id. (quoting Geller, 2021 WL 6502215, at *8). Additionally, Petitioner here was younger at injury onset, and thus, will likely suffer the effects of his vaccine injury for longer. Id. at 16-17 (citing Geller, 2021 WL 6502215, at *12). And Petitioner here did not suffer from comorbidities like the Geller petitioner, and "[a]s such, [Petitioner's] pain and limitations are entirely attributable to his vaccine injury." Id. at 17. Petitioner concludes this comparison supports the higher award for past pain and suffering. Id.

Due to the paucity of reasoned damages decisions involving brachial neuritis, Petitioner also relies on SIRVA damages decisions despite the differences between the injuries. Pet. Br. at 13 (citing Geller, 2021 WL 6502215, at *8 (relying on SIRVA damages decisions "[d]ue to the lack of reasoned decisions awarding damages in brachial neuritis cases" and acknowledging "SIRVA cases are a reasonable albeit imperfect comparison point for cases involving brachial neuritis")).

First, Petitioner cites to damages data for SIRVA cases, but acknowledges that "[b]ecause the symptoms and treatments of SIRVA and PTS are different, a line-by-line comparison of these bullet lists matched against [Petitioner's] experience is not particularly useful." Pet. Mot. at 13-15. However, Petitioner maintains that "even though he suffers from PTS, [he] satisfies

most of the factors that set apart SIRVA cases in which damages for past pain and suffering were above the median proffer figure of $95,000.00.  Id. at 15.  And in those cases, "awards for past pain and suffering . . . ranged from $110,000.00 to $160,000.00, which [Petitioner argues] is supportive of the damages amount [Petitioner] seeks here, $130,000.00."  Id.

Next, Petitioner discusses Leslie, where the Chief Special Master awarded $125,000.00 in pain and suffering in a case of a SIRVA following influenza vaccination.  Pet. Br. at 17 (citing Leslie v. Sec'y of Health & Hum. Servs., No. 18-0039V, 2021 WL 837139 , at *1 (Fed. Cl. Spec. Mstr. Jan. 28, 2021)).  In Leslie, the petitioner experienced pain and difficulty using his arm for three to four weeks.  Id. (citing Leslie, 2021 WL 837139, at *2).  He rated his pain between 2/10 and 4/10 a few months later.  Id. (citing Leslie, 2021 WL 837139, at *2).  Following a plateau in recovery, he received a cortisone injection and attended four physical therapy sessions, after which he reported being pain free and having returned to his functional baseline.  Id. (citing Leslie, 2021 WL 837139, at *3-5).  MRI showed bone erosion.  Id. (citing Leslie, 2021 WL 837139, at *10-11).  Overall, the Leslie petitioner's injury was characterized as mild since surgery and extensive physical therapy were not required and a complete recovery was made.  Id. (citing Leslie, 2021 WL 837139, at *10-11).

In comparison, Petitioner asserts his injury "cannot fairly be considered mild," due to the "pain and significant limitations [experienced] for years, . . . which continue[s] to disrupt his life and work to this day."  Pet. Br. at 17.  Even though there is no bone erosion here, Petitioner maintains "significant uncertainty remains related to his lingering symptoms, including whether he will ever make a full recovery or return to baseline."  Id. at 17-18.

Petitioner also compares his case to Danielson, a case in which the petitioner experienced pain related to her SIRVA immediately following influenza vaccination.  Pet. Br. at 18 (citing Danielson v. Sec'y of Health & Hum. Servs., No. 18-1878V, 2020 WL 8271642, at *1-3 (Fed. Cl. Spec. Mstr. Dec. 29, 2020)).  The symptoms were described as mild to moderate in the beginning, with pain rising to extreme several months later.  Id. (citing Danielson, 2020 WL 8271642, at *3).  Petitioner in Danielson attended numerous chiropractic appointments during this time and complained of pain in areas other than the affected shoulder.  Id. (citing Danielson, 2020 WL 8271642, at *4).  Chiropractic records showed the petitioner achieved "good pain relief," allowing her to engage in activities such as mowing the yard and kayaking.  Id. (citing Danielson, 2020 WL 8271642, at *3).  Overall, the petitioner in Danielson underwent 11 physical therapy sessions and three steroid injections and the Chief Special Master awarded $110,000.00 in past pain and suffering.  Id. (citing Danielson, 2020 WL 8271642, at *1, *3-4).  Petitioner here stressed that the Danielson petitioner "experienced prior and continued pain in areas other than the left shoulder where she received her vaccination," which was taken into account by the Chief Special Master when determining the award.  Id. (citing Danielson, 2020 WL 8271642, at *4).

Here, Petitioner notes he, like the Danielson petitioner, suffered pain for multiple years and attended a comparable number of physical therapy sessions.  Pet. Br. at 19.  Unlike the Danielson petitioner, Petitioner here states that he did not suffer from any pre-existing pain or comorbidities that impacted or exacerbated his shoulder injury.  Id.  And thus, "all his shoulder pain and the significant limitations that accompanied the pain are attributable to his vaccine

injury."  Id.  Petitioner asserts this distinction supports the larger damages award requested by Petitioner.  Id.

Regarding Respondent's reliance on Kent, a case in which the petitioner was awarded $80,000 for pain and suffering for a SIRVA injury, Petitioner asserts the facts here are different. Pet. Reply Br. at 6-7 (citing Kent v. Sec'y of Health & Hum. Servs., No. 17-0073V, 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Aug. 7, 2019).  Respondent argues the Kent petitioner's pain was more severe at 10/10, but Petitioner here contends he complained of pain higher than 8/10 on multiple occasions.  Id. at 6 (citing Pet. Ex. 2 at 16-18, 21-22).  Unlike the Kent petitioner, who only sought treatment for 10 months, Petitioner here maintains he "has consistently sought treatment for the duration of his injury" as evidenced by his March 2022 visit more than three years after injury onset.  Id. at 6, 6-7 n.4.  Additionally, Petitioner asserts his physical therapy records confirm his injury was "considerably more severe" than the petitioner's injury in Kent because his physical therapy records indicated a goal to complete activities "with only moderate difficulty," while the Kent petitioner was able to recover within about 10 months.  Id. at 7.

Therefore, Petitioner requests $130,000.00 for pain and suffering that he has endured for years.  Pet. Br. at 19; Pet. Reply Br. at 8-9.  Overall, Petitioner "has undergone multiple MRIs, has completed a course of physical therapy, and remains on an at-home exercise regimen.  His injury has impacted his work, hampered his ability to participate in multiple activities, and continues to interfere with basic everyday tasks, such as putting on a seatbelt."  Pet. Br. at 19; see also Pet. Reply Br. at 8-9.  Petitioner contends he "remains in persistent pain."  Pet. Reply Br. at 8-9.

## 2.    Respondent's Contentions

Respondent argues that based on the facts of this case, Petitioner should be awarded $65,000.00 for pain and suffering.  Resp. Br. at 1, 9, 15-16.  First, "[R]espondent agrees awareness of the injury is not at issue."  Id. at 9.

Respondent argues Petitioner's injury was mild-to-moderate and limited in duration. Resp. Br. at 10-11.  Respondent summarizes that Petitioner's pain was intermittent and ranged from 1/10 to 7/10.  Id. at 10.  His treatment consisted of one urgent care visit, four orthopedic visits, one primary care visit, two PM&R visits, three MRIs,[11] and 10 sessions of physical therapy.[12]  Id.  Three-and-one-half months after vaccination, Petitioner reported "intermittent pain" that was "no longer limiting (his) tolerance for dressing, work duties[,] or recreational activities."  Id. (quoting Pet. Ex. 5 at 16-17).  Petitioner's medical record also noted "[h]e ha[d] been surfing as well without [shoulder] pain."  Id. (quoting Pet. Ex. 5 at 16).  One month later, Petitioner was discharged from physical therapy with notes that his "[right] shoulder pain ha[d]

---

[11] Petitioner underwent a fourth MRI in January 2020.

[12] This appears to be incorrect.  Petitioner attended two physical therapy sessions with Mr. Caffaro in October 2018 and 10 sessions at PT by the Sea from November 2018 to February 2019, for a total of 12 physical therapy sessions.  Pet. Ex. 3 at 13-16; Pet. Ex. 5 at 3-27.

resolved" and "left shoulder pain with overhead movements remained." Id. (quoting Pet. Ex. 5 at 23).

For the next three months (between months five and eight post-vaccination), Respondent notes there is a gap in treatment. Resp. Br. at 10. Respondent notes Petitioner saw other providers during this time, but sought no tests or treatment related to his vaccine injury. Id. And when Petitioner returned to his orthopedist Dr. O'Malley in June 2019, four months after his last physical therapy session, Petitioner described the pain as "sporadic" and "occasionally sharp" and rated the pain 5/10 that day. Id. (citing Pet. Ex. 3 at 10). Dr. O'Malley, on June 25, 2019, "expect[ed] [Petitioner] to have improvement" and suggested reassessment in four months. Id. at 11 (quoting Pet. Ex. 3 at 11). However, Petitioner did not return for six-and-one-half months, a gap in which Petitioner saw other providers with no mention of right shoulder pain. Id. (citing Pet. Ex. 8 at 43, 47, 51, 75-77). Respondent maintains Petitioner was not following Dr. O'Malley's treatment plan, and instead had a gap in treatment. Id. Therefore, Respondent concludes "the contemporaneous medical records show that [P]etitioner experienced relief during that time period, demonstrating that his injury was mild and limited." Id.

Respondent argues gaps in treatment are "highly relevant to damages" because it "supports the conclusion that Petitioner's [injury] was mild enough to tolerate for a long period, but also that intervening circumstances could explain some degree of severity thereafter." Resp. Br. at 10-11 (quoting Peeples v. Sec'y of Health & Hum. Servs., No. 20-0634V, 2022 WL 2387749, at *6 (Fed. Cl. Spec. Mstr. May 26, 2022) (citing Shelton v. Sec'y of Health & Hum. Servs., No. 19-279V, 2021 WL 2550093, at *7 (Fed. Cl. Spec. Mstr. May 21, 2021) ("Treatment gaps are a relevant consideration in determining the degree of Petitioner's pain and suffering.")).

Respondent contends Petitioner was "only actively treated for around six months:" October 2018 to February 2019 and May 31, 2019 to June 24, 2019. Resp. Br. at 15, 15 n.5. Respondent explains that in June 2019, Petitioner reported "sporadic" pain, and in January 2020, the pain "waxed and waned" and his examination revealed no numbness or tinging and excellent strength. Id. at 15. Thus, Respondent argues that Petitioner's record from January 2020, and the record thereafter, are not consistent with Petitioner's post-Tdap brachial neuritis; instead, Respondent contends "the difference in his symptoms, presentation, and reported pain from his initial presentation to January 2020 seem to indicate that [Petitioner's] [brachial neuritis] injury resolved during the six-and-one-half month treatment gap." Id. at 15, 15 n.5.

Next, Respondent discusses the Vaccine Program cases relied upon by Petitioner.[13] Resp. Br. at 11-12. First, Respondent argues this case is factually distinguishable from Geller. Id. at 12. Petitioner in Geller suffered pain that woke him from sleep within two days of vaccination, his pain prevented him from going to work, his pain forced him to primarily lay supine, and he was prescribed oxycodone and escalating doses of steroids before he started physical therapy, which was ultimately unsuccessful. Id. (citing Geller, 2021 WL 6502215, at

---

[13] The undersigned does not find Respondent's reference to proffered brachial neuritis cases helpful in determining an award for pain and suffering here, as the facts and circumstances of those cases that led to the proffered amount are not known. Therefore, she does not discuss this aspect of Respondent's argument.

*2-3).  Five months post-vaccination, the <u>Geller</u> petitioner could carry a briefcase and type, although he continued to have fine motor dysfunction.  <u>Id.</u>  Petitioner in <u>Geller</u> had "'substantial deficits' subsequent to his brachial neuritis [that] caused major deficits in strength, fine motor control of the fingers and hand, and loss of motor coordination," and his expert opined this injury to be a "permanent weakness."  <u>Id.</u> (quoting <u>Geller</u>, 2021 WL 6502215, at *8, *11-12).

Here, according to Respondent, Petitioner has a milder case than the petitioner in <u>Geller</u>. Resp. Br. at 12.  First, Petitioner did not seek nor was prescribed steroids.  <u>Id.</u>  Second, his affidavit and medical records do not support a finding that his incapacitation was the same level as the petitioner in <u>Geller</u> (who was required to lay supine and was unable to work).  <u>Id.</u> (citing <u>Geller</u>, 2021 WL 6502215, at *2-3).  Third, Petitioner demonstrated steady progress in physical therapy, whereas the petitioner in <u>Geller</u> did not.  <u>Id.</u> (citing <u>Geller</u>, 2021 WL 6502215, at *3). Thus, Respondent maintains Petitioner had limited symptoms and better long-term resolution than the petitioner in <u>Geller</u>, and as such, should receive a pain and suffering award lower than the award in <u>Geller</u> ($125,000.00).  <u>Id.</u> (citing <u>Geller</u>, 2021 WL 6502215, at *1).

Respondent next discusses comparable SIRVA cases and the SIRVA cases discussed by Petitioner.[14]  Resp. Br. at 13-15.  <u>Leslie</u>, for example, pertained to a petitioner with a condition that was more severe than Petitioner's here.  <u>Id.</u> at 13.  Petitioner in <u>Leslie</u> was diagnosed with bone erosion on MRI, received a cortisone injection after additional physical therapy, and underwent an unsuccessful glenohumeral aspiration, none of which occurred in this case.  <u>Id.</u> at 13-14 (citing <u>Leslie</u>, 2021 WL 837139, at *2-5).  In <u>Leslie</u>, the Chief Special Master awarded a "somewhat larger" award of $125,000.00 for pain and suffering "than an otherwise 'similarly-situated petitioner whose course was relatively short and featured mild symptoms and limited treatment' might receive" due to extenuating circumstances that are not present in this case.  <u>Id.</u> at 14 (quoting <u>Leslie</u>, 2021 WL 837139, at *10).

Respondent asserts Petitioner's case is most analogous to <u>Kent</u>, although he argues that Petitioner's course was not as severe as the petitioner's course in <u>Kent</u>.  Resp. Br. at 14.  In <u>Kent</u>, the petitioner's SIRVA lasted approximately 10 months, with the first six months being the most significant.  <u>Id.</u> at 14-15 (citing <u>Kent</u>, 2019 WL 5579493, at *11).  By comparison, Respondent states that Petitioner's "overall treatment was of a shorter duration," specifically around six months, from October 2018 to February 2019 and May 31, 2019 to June 24, 2019.  <u>Id.</u> at 14-15, 15 n.5.  Additionally, Respondent notes the petitioner in <u>Kent</u> reported pain that was 10/10, and Petitioner's pain here peaked at 8/10.[15]  <u>Id.</u> at 14 (citing <u>Kent</u>, 2019 WL 5579493, at *3).  <u>But see, e.g.</u>, Pet. Ex. 4 at 22 (rating his pain 10/10 on October 31, 2018).  Furthermore, the petitioner in <u>Kent</u> completed 32 physical therapy sessions, which left her with residual limitations on range of motion, and Petitioner here attended only 10 physical therapy sessions,[16]

---

[14] Respondent does not address the <u>Danielson</u> case referenced by Petitioner.  <u>See</u> Resp. Br. at 1-16; <u>Danielson</u>, 2020 WL 8271642.

[15] This is not accurate.  <u>See</u> Pet. Ex. 3 at 17 (rating his pain 9/10 on October 19, 2018); Pet. Ex. 4 at 22 (rating his pain 10/10 on October 31, 2018).

[16] Again, this number is inaccurate.  <u>See</u> <u>supra</u> note 12.

after which he reported complete resolution of his shoulder pain. Id. (citing Kent, 2019 WL 5579493, at *13). Therefore, Respondent contends a comparison of Petitioner's case to Kent suggests an award less than that given in Kent ($80,000.00). Id. at 15.

Overall, Respondent maintains a pain and suffering award of $65,000.00 is appropriate and supported by the evidence in this case given the mild nature of Petitioner's injury. Resp. Br. at 15. "[P]etitioner (1) understood his injury, (2) his injury was not severe, as it resolved through non-in[v]asive treatment, and (3) he was subjected to the primary sequela for four-to-five months." Id. Thus, Respondent argues that Petitioner failed to show that his proposed award of $130,000.00 is supported by the facts or the law, and instead, an award of $65,000.00 for pain and suffering should be awarded. Id. at 15-16.

## IV.   LEGAL FRAMEWORK

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Petitioner bears the burden of proof with respect to each element of compensation requested. Brewer v. Sec'y of Health & Hum. Servs., No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. I.D. v. Sec'y of Health & Hum. Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); Stansfield v. Sec'y of Health & Hum. Servs., No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: (i) awareness of the injury; (ii) severity of the injury; and (iii) duration of the suffering. I.D., 2013 WL 2448125, at *9 (quoting McAllister v. Sec'y of Health & Hum. Servs., No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated & remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case. See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs., 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). The undersigned may also rely on her experience adjudicating similar claims. Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. See Graves v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 579 (2013).

In Graves, Judge Merow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory

$250,000.00 cap.  Judge Merow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly."  Graves, 109 Fed. Cl. at 589-90.  Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program.  Id. at 595.

# V.   ANALYSIS

## A.   Petitioner's Award for Actual Pain and Suffering

In determining an award in this case, the undersigned does not rely on a single decision or case.  Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.  The undersigned has reviewed the entire record, including medical records, affidavits, and all other evidence that has been filed, and finds an award of $100,000.00 in actual pain and suffering is fair, reasonable, and appropriate here.

It is appropriate to consider the awareness of the injury, severity of the injury, and duration of the suffering when determining an award for pain and suffering and emotional distress.  In the undersigned's experience, awareness of suffering is not typically a disputed issue in cases involving brachial neuritis.  In this case, neither party has raised, nor is the undersigned aware of, any issue concerning Petitioner's awareness of suffering.  Pet. Br. at 7; Resp. Br. at 9 ("[R]espondent agrees awareness of the injury is not at issue.").  Thus, based on the circumstances of this case, the undersigned determines Petitioner's awareness of the injury is not in dispute and he has full awareness of his suffering.

The factors that particularly influence this Decision are as follows.  Regarding duration, Petitioner received a Tdap vaccination on September 28, 2018, and began experiencing pain on October 3, 2018.  Petitioner contends his pain, weakness, and significant limitations lasted "more than three years" and he "remains in persistent pain." Pet. Br. at 11; Pet. Reply Br. at 8-9.  Respondent contends Petitioner's suffering was "limited in duration" and included treatment for six months, from October 2018 to February 2019 and May 31, 2019 to June 24, 2019.  Resp. Br. at 10-11, 15 n.5.

The undersigned is not persuaded by either parties' arguments as to duration.  The medical records show Petitioner actively sought treatment and suffered from his injury from October 2018 to December 2020.  Petitioner averred that as of December 9, 2020, "the pain in [his] right shoulder comes and goes, and when it sets in, it generally lasts for a few days at a time and nothing alleviates it."  Pet. Ex. 9 at ¶ 7.  He rated his current pain between 3/10 and 7/10.  Id. Thereafter, Petitioner did not seek treatment for his brachial neuritis until March 21, 2022, more than 15 months later.  Thus, the undersigned finds there is a gap in treatment.  See Peeples, 2022 WL 2387749, at *6 (noting a 15-month gap in treatment); Pet. Reply Br. at 3 (acknowledging the 15-month gap in treatment in Peeples).  Petitioner failed to explain this gap in treatment.  See Peeples, 2022 WL 2387749, at *6 (noting the evidence "clearly support[ed] the reasons

Petitioner provided for the 15-month gap in treatment").  Additionally, the undersigned notes
Petitioner has not seen a provider since March 21, 2022 or provided any evidence that he
continued to suffer from his brachial neuritis injury after December 9, 2020.  Petitioner's
counsel's statements that Petitioner "remains in persistent pain" are not evidence in the record
that can be used to support a finding that Petitioner continues to suffer from his injury.  Pet.
Reply Br. at 8-9.  Therefore, the undersigned concludes Petitioner suffered from his vaccine-
related injury for 26 months, from October 2018 to December 2020.

Regarding severity, the undersigned finds Petitioner's injury was moderate.  Over the
course of his injury and treatment, he rated his pain 1/10 to 10/10.  From October 2018 to
December 2020, his treatment consisted of one urgent care visit, four orthopedic visits, one
primary care visit, two PM&R visits, one EMG, four MRIs, 12 sessions of physical therapy, and
prescriptions for anti-inflammatories (ibuprofen and Naproxen) and Norco (pain relief).
Petitioner did not require any invasive treatment (surgery) or steroid injections.  Throughout the
course of his injury, his treating providers documented 5/5 strength and good range of motion,
although he had pain with range of motion.  His "excruciating" pain lasted approximately seven
weeks, from October 2018 until November 20, 2018.  See Pet. Ex. 6 at 2 (reporting the pain was
"not excruciating anymore" on November 20, 2018).  After November 20, 2018, through 2020,
treating providers documented that Petitioner rated his pain 5/10 at the maximum.

The undersigned does not find the Vaccine Program cases provided by the parties to be
comparable to this case.  First, the petitioner in Geller, unlike Petitioner here, was unable to
work, was prescribed oxycodone and steroids, did not improve with physical therapy, continued
to have fine motor deficits, and was determined to have a permanent injury by an expert, all of
which supported a $125,000.00 award for pain and suffering.  Petitioner's intense pain here
lasted longer than the petitioner's intense pain in Geller (seven weeks versus two weeks).  And
Petitioner's deficits here were all reported to be a result of his vaccine-related injury, unlike the
petitioner in Geller.  However, the undersigned does not find these facts and circumstances to be
sufficient evidence to support a higher award for pain and suffering.

Next, the undersigned finds Leslie to be a more severe case than Petitioner's.  In Leslie,
the petitioner underwent an MRI that showed bone erosion, received a cortisone injection,
completed four sessions of physical therapy, and underwent an unsuccessful glenohumeral
aspiration.  Petitioner here reported higher pain levels and underwent more MRIs than the Leslie
petitioner.  However, the petitioner in Leslie required testing to rule out an infection in his
shoulder, which led to a delay in effective treatment and months of additional suffering.  Thus,
the undersigned again does not find the facts and circumstances here support a higher pain and
suffering award than that awarded in Leslie ($125,000.00).

The Danielson petitioner, who was awarded $110,000.00 for pain and suffering,
underwent two MRIs (Petitioner here had three MRIs), 11 physical therapy sessions (Petitioner
here had 12 sessions), and three steroid injections (Petitioner here had none).  Petitioner in
Danielson had a four-month delay in seeking medical care, which indicated to the Chief Special
Master the initial pain was not severe, however, the moderate-to-severe pain lasted more than
three years, which is longer than Petitioner's pain for seven weeks and 26-month duration of
suffering overall.  Petitioner in Danielson experienced prior and continued pain in areas other

than the vaccinated shoulder, unlike Petitioner here.  The undersigned finds the facts and circumstances in Danielson to be somewhat similar to this case; however, the Danielson petitioner suffered worse pain for longer and had three steroid injections.  The undersigned does not find these facts and circumstances support an award of $130,000.00 for pain and suffering here, $20,000.00 more than that awarded in Danielson.

Lastly, with regard to the petitioner in Kent, who was awarded $80,000.00, treatment lasted 10 months, pain was reported to be 10/10, and 32 physical therapy sessions were completed.  Here, Petitioner's injury lasted 26 months, pain was also rated at 10/10, and only 12 physical therapy sessions were completed.  Even though the Kent petitioner completed significantly more physical therapy than Petitioner here, the Kent petitioner's duration of suffering was significantly less.  This distinction supports an award of pain and suffering greater than that awarded in Kent.

The undersigned has considered the numbers proposed by both parties; however, she does not agree that the amount suggested by either party is appropriate.  Considering the record as a whole, the undersigned finds that $100,000.00 represents a fair, reasonable, and appropriate amount of compensation for Petitioner's pain and suffering.  The award of $100,000.00 acknowledges Petitioner's duration of suffering and severity of injury.

## VI.   CONCLUSION

In determining an award in this case, the undersigned does not rely on a single decision or case.  Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.

In light of the above analysis, and in consideration of the record as a whole, the undersigned finds that Petitioner is entitled to an award as ordered below:

**The undersigned awards a lump sum payment of $100,000.00, representing actual pain and suffering, in the form of a check payable to Petitioner.**  This amount represents compensation for all damages that would be available under § 300aa-15(a).

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Special Master